# IN THE SUPREME COURT OF CALIFORNIA

COUNTY OF SAN DIEGO et al.,
Plaintiffs and Appellants,

v.

COMMISSION ON STATE MANDATES,
Defendants and Respondents.

S239907

Fourth Appellate District, Division One
D068657

San Diego County Superior Court
37-2014-00005050-CU-WM-CTL

November 19, 2018

Justice Cuéllar filed the opinion of the court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Liu, Kruger, and Meehan concurred.

# COUNTY OF SAN DIEGO v. COMMISSION ON STATE MANDATES

## S239907

Opinion of the Court by Cuéllar, J.

When convicted sex offenders have a diagnosed mental disorder making it likely they would engage in sexually violent behavior if released, they are subject to civil commitment proceedings under the Sexually Violent Predators Act (SVPA; Welf. & Inst. Code, § 6600 et seq.). County governments are responsible for filing the commitment petition, providing counsel and experts for all hearings on the petition, and housing the individual potentially subject to commitment while the petition is adjudicated. Carrying out these tasks takes more than diligence and organization from counties — it takes money. What we must decide in this case is who pays for the duties the SVPA imposes on county governments.

For the first 15 years of the SVPA's existence, it was the State of California that — according to the Commission on State Mandates (Commission) — had to foot the bill. But in early 2013, the Department of Finance (Department) asked the Commission to reconsider its earlier decision and declare that the SVPA was no longer a state-mandated program. The Department argued that the state's financial responsibility ceased on November 7, 2006, when the voters enacted The Sexual Predator Punishment and Control Act: Jessica's Law (Proposition 83), which "substantively amended and reenacted various sections of the Welfare and Institutions Code that had served as the basis for the Commission's Statement of Decision."

(See Gov. Code, § 17556, subd. (f) [duties that are "expressly included in" or "necessary to implement" a ballot measure do not constitute "costs mandated by the state"].) The Commission approved the Department's request for redetermination in part and identified six county duties (and part of a seventh) that, effective July 1, 2011,[1] no longer constituted reimbursable state mandates. (Cal. Com. on State Mandates, Statement of Decision No. 12-MR-01 (Dec. 6, 2013), pp. 54-55 <https://www.csm.ca.gov/decisions/doc96.pdf> [as of November 15, 2018]; all Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.)

Soon thereafter, the counties of San Diego, Los Angeles, Orange, Sacramento, and San Bernardino (collectively, the Counties) filed a petition for writ of administrative mandate and a complaint for declaratory relief against the Commission, the State of California, the Department, and John Chiang in his then-official capacity as State Controller (collectively, the State respondents). The San Diego County Superior Court denied the petition and dismissed the complaint. The Court of Appeal reversed, finding that Proposition 83 did not alter in any way the state's obligation to reimburse the Counties for the costs of implementing the SVPA. (*County of San Diego v. Commission on State Mandates* (2016) 7 Cal.App.5th 12, 18 (*County of San Diego*).). We agree that the Commission erred when it treated Proposition 83 as a basis for terminating the state's obligation to reimburse the Counties simply because certain provisions of

---

[1] Under Government Code section 17557, subdivision (e), a test claim submitted on or before June 30 following a fiscal year establishes "eligibility for reimbursement for that fiscal year."

2

the SVPA had been restated without substantive change in Proposition 83. But we also remand the matter to the Commission so it can determine, in the first instance, whether and how the initiative's expanded definition of an SVP may affect the state's obligation to reimburse the Counties for implementing the amended statute.

## I.

### A.

The state has conditional authority to enlist a local government in carrying out a new program or providing a higher level of service for an existing program. Only when the state "reimburse[s] that local government for the costs of the program or increased level of service" may the state impose such a mandate on its local governments. (Cal. Const., art. XIII B, § 6, subd. (a).) No reimbursement is required, though, where "[t]he statute or executive order imposes a requirement that is mandated by a federal law or regulation and results in costs mandated by the federal government" (Gov. Code, § 17556, subd. (c)) or where "[t]he statute or executive order imposes duties that are necessary to implement, or are expressly included in, a ballot measure approved by the voters in a statewide or local election" (*id.*, subd. (f)).

Predictably, local governments often disagree with the state about who is responsible for funding new programs. For the first five years after article XIII B was adopted, such unresolved disputes ended up in court. This arrangement led to unnecessary litigation, burdened the judiciary, delayed reimbursement, and injected uncertainty into budget planning at both the state and local levels. (See *Kinlaw v. State of California* (1991) 54 Cal.3d 326, 331; Gov. Code, § 17500.)

Eventually, the Legislature created the Commission to streamline resolution of these disputes (Gov. Code, §§ 17525, 17551), and adopted procedures for submission and adjudication of reimbursement claims (§ 17500 et seq.). So when the Legislature now enacts a statute imposing obligations on a local agency without providing adequate funding to allow the locality to discharge those obligations, the local entity may file a "test claim" with the Commission. (§ 17521; see *Lucia Mar Unified School Dist. v. Honig* (1988) 44 Cal.3d 830, 833.) The Commission then decides, after a hearing, whether the statute that is the subject of the test claim under review (i.e., the test claim statute) mandates a new program or an increased level of service and, if so, the amount to be reimbursed. (§§ 17551, 17557.) Either the local agency or the state may challenge the Commission's decision in court by filing a petition for writ of administrative mandate. (§ 17559, subd. (b).)

In 2010, the Legislature enabled either party to request reconsideration of a prior Commission decision. Using formal procedures prescribed by statute, an affected state or local agency may ask that the Commission "adopt a new test claim decision to supersede a previously adopted test claim decision . . . upon a showing that the state's liability for that test claim decision . . . has been modified based on a subsequent change in law." (Gov. Code, § 17570, subd. (b).) Section 17570, subdivision (a)(2) defines a " '[s]ubsequent change in law' " as a "change in law that requires a finding that an incurred cost is a cost mandated by the state, as defined by Section 17514, or is not a cost mandated by the state pursuant to Section 17556." Under the Commission's regulations implementing these provisions, the request for a new test claim decision proceeds in two steps. At the first hearing, the Commission decides whether the

requesting agency "has made an adequate showing" of "a subsequent change in law . . . material to the prior test claim decision." (Cal. Code Regs., tit. 2, § 1190.5, subd. (a)(1).) A showing is "adequate" if the Commission finds the requesting agency "has a substantial possibility of prevailing at the second hearing." (*Ibid.*) At the second hearing, the Commission decides "whether the state's liability . . . has been modified based on the subsequent change in law alleged by the requester, thus requiring adoption of a new test claim decision to supersede the previously adopted test claim decision." (*Id.*, subd. (b)(1).) If so, the Commission "shall adopt a new decision that reflects the modified liability of the state." (*Ibid.*)

## B.

The SVPA was enacted by the Legislature in 1995 to enable the involuntary civil commitment of certain persons. The individuals subject to civil commitment under the SVPA are those who, following completion of their prison terms, have a diagnosed mental disorder that makes them likely to engage in sexually violent behavior. (Welf. & Inst. Code, § 6600, subd. (a)(1); see *People v. Roberge* (2003) 29 Cal.4th 979, 984.) Subsequently, the County of Los Angeles filed a test claim seeking reimbursement from the state for the costs of complying with the duties imposed by the SVPA. On June 25, 1998, the Commission adopted a statement of decision approving reimbursement for the following eight specific local government duties (Cal. Com. on State Mandates, Statement of Decision No. CSM-4509 (June 25, 1998) p. 12 <https://csm.ca.gov/matters/4509/doc1.pdf> [as of November 15, 2018]):

1. Designation by the County Board of Supervisors of the appropriate district attorney or county counsel who will be

responsible for the SVP civil commitment proceedings (Welf. & Inst. Code, § 6601, subd. (i));

2.  Initial review of reports and records by the county's designated counsel to determine whether the county concurs with the state's recommendation (Welf. & Inst. Code, § 6601, subd. (i));

3.  Preparation and filing of the petition for commitment by the county's designated counsel (Welf. & Inst. Code, § 6601, subd. (i));

4.  Preparation and attendance by the county's designated counsel and indigent defense counsel at the probable cause hearing (Welf. & Inst. Code, § 6602);

5.  Preparation and attendance by the county's designated counsel and indigent defense counsel at trial (Welf. & Inst. Code, §§ 6603, 6604);

6.  Preparation and attendance by the county's designated counsel and indigent defense counsel at subsequent hearings regarding the condition of the SVP (Welf. & Inst. Code, §§ 6605, former subds. (b)-(d), 6608, subds. (a) & (b), former subdivisions (c) & (d));

7.  Retention of necessary experts, investigators, and professionals for preparation for trial and subsequent hearings regarding the condition of the SVP (Welf. & Inst. Code, §§ 6603, 6605, former subd. (d)); and

8.  Transportation and housing for each potential SVP at a secured facility while the individual awaits trial on the SVP determination.  (Welf. & Inst. Code, § 6602.)

The Department then began reimbursing counties in a manner consistent with the Commission's decision.  For fiscal

year 2012-2013, the state reimbursed counties approximately $20.75 million to cover the cost of implementing the SVP mandate. The Department estimated the mandate costs for fiscal year 2013-2014 to be approximately $21.79 million.

In January 2013, though, the Department sought to terminate these payments by requesting that the Commission adopt a new test claim under Government Code section 17570. In the Department's view, the state mandate ended when the voters enacted Proposition 83 at the November 7, 2006, General Election. The Department argued that each of the state-mandated duties was now either "expressly included in" or "necessary to implement" Proposition 83, "a ballot measure approved by the voters in a statewide . . . election." (Gov. Code, § 17556, subd. (f).)

It is true that Proposition 83 included several of the statutory mandates on which the Commission's 1998 ruling relied. But as the parties concede, these provisions were reprinted in Proposition 83 solely because the California Constitution requires that "[a] section of a statute may not be amended unless the section is re-enacted as amended." (Cal. Const., art. IV, § 9.) Both parties admit Proposition 83 made no changes to many of the provisions the Commission had identified as imposing state-mandated duties on local governments and revised the remainder only in nonsubstantive ways. Nonetheless, on July 26, 2013, the Commission determined that the Department had made a sufficient showing of a " 'subsequent change in law' " within the meaning of Government Code section 17570, subdivision (a)(2) to raise a substantial possibility of prevailing at the second hearing. (Cal. Com. on State Mandates, Statement of Decision No. 12-MR-01 (July 26, 2013), p. 13 <https://csm.ca.gov/matters/4509/

doc55.pdf> [as of November 15, 2018]; see Cal. Code Regs., tit. 2, § 1190.5, subd. (a)(1).) The Commission deemed it "irrelevant . . . whether Proposition 83 made any *substantive* changes to the SVP code sections" and instead found it sufficient that the "ballot measure expressly includes some of the same activities as the test claim statutes that were found to impose a reimbursable mandate" in the Commission's 1998 ruling. (Cal. Com. on State Mandates, Statement of Decision No. 12-MR-01 (July 26, 2013), *supra*, at p. 18, italics added.)

Following the second hearing, the Commission determined that Proposition 83 had transformed six of the eight listed local government duties (and part of a seventh) from reimbursable state-mandated activities into nonreimbursable voter-mandated activities. Once again, the Commission deemed it "irrelevant . . . whether Proposition 83 made any substantive changes at all to the SVP code sections." (Cal. Com. on State Mandates, Statement of Decision No. 12-MR-01 (Dec. 6, 2013), *supra*, at p. 39.) What proved pivotal for the Commission instead was "that Proposition 83 amended and reenacted wholesale most of the code sections that gave rise to the mandated activities found in the [original] test claim." (*Ibid.*)

Accordingly, local government duties 1, 2, 3, 6, and part of 7, which were "expressly included" in the ballot measure, were no longer reimbursable. (Cal. Com. on State Mandates, Statement of Decision No. 12-MR-01 (Dec. 6, 2013), *supra*, at pp. 23-25.) The Commission further reasoned that local government duty 5 (the preparation and attendance at trial by the county's designated counsel and appointed counsel for indigents), the remainder of local government duty 7 (the retention of necessary experts for trial), and part of local government duty 8 (transportation and housing of SVP while

awaiting trial) were "required in order to satisfy due process." (*Id*. at p. 34; see *id*. at pp. 36-37.) Because these activities were "necessary to implement" the ballot measure, they likewise were no longer reimbursable. (*Id*. at pp. 36-37.) Only local government duty 4 (preparation and attendance by counsel at a probable cause hearing) and the remainder of local government duty 8 (transportation to and from a state-mandated probable cause hearing) were deemed by the Commission to be reimbursable costs: the statutory provisions underlying these activities were neither reenacted in the ballot measure nor required by due process. (*Id*. at pp. 33, 37, 54-55.) In declaring that local government duties 1, 2, 3, 5, 6, 7, and part of 8 were no longer state mandates, the Commission did not rely on — let alone discuss — the theory that these duties might be nonreimbursable because they are necessary to implement Proposition 83's expanded definition of an SVP.[2]

The Counties responded by filing a petition for a writ of administrative mandate and a complaint for declaratory relief. The writ petition sought an order setting aside the Commission's statements of decision issued on July 26, 2013,

---

[2]    Proposition 83 expanded the definition of "sexually violent predator" to include those who have a diagnosed mental disorder rendering them likely to engage in sexually violent behavior and have been convicted of a sexually violent offense "against *one* or more victims." (Welf. & Inst. Code, § 6600, subd. (a)(1), italics added.) Prior to Proposition 83, an SVP included only those who had been convicted of a qualifying offense "against *two* or more victims." (Welf. & Inst. Code, § 6600, former subd. (a)(1), italics added; Stats. 2006, ch. 337, § 53, p. 2661.) Prior law also permitted only *one* prior juvenile adjudication of a sexually violent offense to be used as a qualifying conviction (§ 6600, former subd. (g); Stats. 2006, ch. 337, § 53, p. 2661), but Proposition 83 removed that limitation. (§ 6600, subd. (g).)

and December 6, 2013. The complaint asked for a declaration that Government Code sections 17556, subdivision (f) and 17570 are unconstitutional and that the costs incurred by localities in carrying out the SVPA continue to be reimbursable. The trial court denied relief. The court reasoned that Proposition 83 broadened the definition of an SVP and thus "was more than a mere restatement" of existing law. Even if Proposition 83 were construed as a "simple reenactment," though, "the effect of voter-approval cannot be ignored as transforming certain requirements of the Act into voter-approved mandates." The court also rejected the Counties' challenges to the constitutionality of the two statutes.

The Court of Appeal reversed and remanded the matter to the Commission for reconsideration. It found that the statutory duties identified in the Commission's 2013 test claim ruling were neither necessary to implement nor expressly included in Proposition 83 "[b]ecause the duties imposed by the statutes at issue were not affected by Proposition 83." (*County of San Diego*, *supra*, 7 Cal.App.5th at p. 34.) The court declined to accord any significance to the ballot measure's expanded definition of an SVP (see fn. 2, *ante*) because the Commission's 1998 decision had previously concluded that the definition set forth in Welfare and Institutions Code section 6600 "was not a basis for any of the duties for which the Counties sought reimbursement." (*County of San Diego*, at p. 36.)

We granted the State respondents' petition for review to consider whether Proposition 83, by amending and reenacting provisions of the SVPA, constituted a "subsequent change in law" sufficient to modify the Commission's prior decision, which directed the State of California to reimburse local governments

for the costs of implementing the SVPA. (Gov. Code, § 17570, subd. (b).)

## II.

To resolve the question before us, we must consider four distinct legal principles. First, the state must reimburse local governments for the costs of discharging mandates imposed by the Legislature. (Cal. Const., art. XIII B, § 6, subd. (a).) Second, this reimbursement requirement does not apply to those activities that are necessary to implement, or are expressly included in, a ballot measure approved by the voters. (Gov. Code, § 17556, subd. (f).) Third, a statute must be reenacted in full as amended if any part of it is amended. (Cal. Const., art. IV, § 9.) And fourth, the Legislature is prohibited from amending an initiative statute unless the initiative itself permits amendment. (*Id.*, art. II, § 10, subd. (c).) The determination whether the statutes at issue here impose a state mandate — and thus require reimbursement — is a question of law we review independently. (See *Department of Finance v. Commission on State Mandates* (2016) 1 Cal.5th 749, 762; *County of San Diego v. State of California* (1997) 15 Cal.4th 68, 109.)

## A.

We begin with the requirement that the state reimburse local governments for costs incurred when the state enlists their assistance in implementing a state program. (See Cal. Const., art. XIII B, § 6.) The voters added this requirement to the state Constitution soon after enacting Proposition 13 (Cal. Const., art. XIII A), a measure that "severely restricted the taxing powers of local governments." (*County of Fresno v. State* (1991) 53 Cal.3d

482, 487.) The purpose of article XIII B, section 6[3] was to prevent the state from unfairly shifting the costs of government onto local entities that were ill-equipped to shoulder the task. (*County of Fresno*, at p. 487.) As a result, the state now, with certain exceptions, must " 'pay for any new governmental programs, or for higher levels of service under existing programs, that it imposes upon local governmental agencies.' " (*County of San Diego v. State of California*, *supra*, 15 Cal.4th at p. 81.)

Government Code section 17556 outlines six circumstances where duties imposed by statute on local governments are not deemed "costs mandated by the state." Among these is the circumstance where "[t]he statute . . . imposes duties that are necessary to implement, or are expressly included in, a ballot measure approved by the voters in a statewide or local election." (§ 17556, subd. (f).) In other words, the state must reimburse local governments for mandates imposed by the Legislature, but not for mandates imposed by the voters themselves through an initiative. (See *California School Boards Assn. v. State of California* (2009) 171 Cal.App.4th 1183, 1207.) Where the Legislature cannot use the ordinary legislative process to amend or alter duties imposed by the voters (see Cal. Const., art. II, § 10, subd. (c)), it can no longer be reasonably characterized as the source of those duties.

---

[3] Article XIII B, section 6, subdivision (a) of the California Constitution provides in relevant part that "[w]henever the Legislature or any state agency mandates a new program or higher level of service on any local government, the State shall provide a subvention of funds to reimburse that local government for the costs of the program or increased level of service . . . ."

The question left unresolved by these provisions is what, precisely, qualifies as a mandate imposed by the voters. Government Code section 17556, subdivision (f) exempts from reimbursement only those "duties that are necessary to implement, or are expressly included in, a ballot measure approved by the voters." The boundaries of this subdivision depend, then, on the definition of a "ballot measure" in section 17556. Our reading of the provision's text, the overall statutory structure, and related constitutional provisions persuades us that not every single word printed in the body of an initiative falls within the scope of the statutory terms "expressly included in . . . a ballot measure." (§ 17556, subd. (f); see *People v. Chavez* (2018) 4 Cal.5th 771, 779.) Discerning the extent of the state's obligation to reimburse local governments for existing state mandates in the wake of a voter-approved initiative that includes the text of a previously enacted law — and the Legislature's power to amend any of its provisions — takes a more nuanced analysis.

Many voter initiatives (such as Proposition 83) amend existing statutory sections. Among these are statutory sections that have already been determined to impose reimbursable duties on local governments. When an existing statutory section is amended — even in the tiniest part — the state Constitution requires the entire section to be reenacted as amended. (Cal. Const., art. IV, § 9; see *Yoshisato v. Superior Court* (1992) 2 Cal.4th 978, 990 (*Yoshisato*) ["The *effect* of this section is that voters considering an initiative . . . that seeks to make discrete *amendments* to selected provisions of an existing statute, are forced to reenact the entire statute as amended in order to accomplish the desired amendments"].) The rationale for compelling reenactment of an entire statutory section when only

13

a part is being amended is to avoid " 'the enactment of statutes in terms so blind that legislators themselves were sometimes deceived in regard to their effect' " and the risk that " 'the public, from the difficulty of making the necessary examination and comparison, failed to become appr[]ised of the changes made in the laws.' " (*Hellman v. Shoulters* (1896) 114 Cal. 136, 152.) Consequently, a substantial part of almost any statutory initiative will include a restatement of existing provisions with only minor, nonsubstantive changes — or no changes at all.

Proposition 83 is an example. It reenacted verbatim subdivision (i) of Welfare and Institutions Code section 6601, which the Commission's 1998 ruling had identified as the source of local government duties 1, 2, and 3. The initiative made changes to individual subdivisions of Welfare and Institutions Code sections 6605 and 6608, which the Commission's 1998 ruling had identified as the source for local government duties 6 and part of 7. But the minor changes to the procedures governing the filing of a petition for conditional release had no effect on those mandated duties. The ballot measure made only one minor, nonsubstantive change to section 6608, subdivision (a) but otherwise restated the statute verbatim. The voters also reenacted verbatim former subdivisions (c) and (d) of section 6605 and, while amending former subdivision (b), made no changes to the mandated duties. Whatever else Proposition 83 accomplished, it effectively left undisturbed these test claim statutes and the various mandates imposed therein.

The Commission nonetheless found the mere existence of Proposition 83 sufficient to transfer fiscal responsibility for the costs of these duties from the state to county governments. In the Commission's view, "the extent and degree of substantive amendments" made by a ballot measure are "immaterial" to the

source of the mandate. (Cal. Com. on State Mandates, Statement of Decision No. 12-MR-01 (Dec. 6, 2013), *supra*, at p. 39.) The Commission believed "it is irrelevant to the analysis . . . whether Proposition 83 made *any substantive changes at all* to the SVP code sections." (*Ibid*., italics added.) What mattered instead, from its perspective, is that "Proposition 83 amended and reenacted wholesale most of the code sections that gave rise to the mandated activities found in the [1998] test claim." (*Ibid*.) Relying simply on the fact that certain SVPA provisions were restated in Proposition 83, the Commission concluded that local government duties 1, 2, 3, and 6 (as well as part of 7) were "expressly included in" a ballot measure within the meaning of Government Code section 17556, subdivision (f).

We conclude that the Commission's approach is at odds with the constitutional requirement that the state reimburse local governments for the costs of complying with state mandates. (Cf. *Yoshisato*, *supra*, 2 Cal.4th at p. 989 [rejecting an interpretation that "assigns undue import to the technical procedures for amending statutes"].) If the term "ballot measure" in Government Code section 17556 were defined as automatically including every provision subject to constitutionally compelled restatement in an initiative, it would sweep in vast swaths of the California Code. Neither the Commission nor the other State respondents point to anything indicating that the Legislature intended to terminate reimbursement for existing state mandates simply because the provisions creating the mandate happened to be restated without change in an initiative statute.

According pivotal significance to a mere technical restatement also would prove difficult to reconcile with Government Code section 9605. What this statute provides is

that "[w]here a section or part of a statute is amended, it is not to be considered as having been repealed and reenacted in the amended form. The portions which are not altered are to be considered as having been the law from the time when they were enacted; the new provisions are to be considered as having been enacted at the time of the amendment . . . ." (Gov. Code, § 9605; see *People v. Cooper* (2002) 27 Cal.4th 38, 44, fn. 4 [where voter-approved amendments "did not substantively change the credits provision" in existing law, "there were no reenactments"].) As we have long held, " '[t]he portions of the amended section which are copied without change are not to be considered as having been repealed and again re-enacted, but to have been the law all along.' " (*Vallejo etc. R. R. Co. v. Reed Orchard Co.* (1918) 177 Cal. 249, 255.) Statutory provisions that are not actually reenacted and are instead considered to " 'have been the law all along' " (*ibid.*) cannot fairly be said to be part of a ballot measure within the meaning of Government Code section 17556, subdivision (f).

Nor does the Commission persuasively reconcile a sweeping transfer of financial responsibility whenever a ballot measure happens to restate a provision containing a state mandate with the voters' intended purpose in California Constitution, article IV, section 9. The purpose of the ban on unfunded mandates was to protect the strapped budgets of local governments in the wake of Proposition 13. (See Ballot Pamp., Gen. Elec. (Nov. 6, 1979) argument in favor of Prop. 4, p. 18 ["this measure WILL NOT allow the state government to force programs on local governments without the state paying for them"]; cf. *California School Boards Assn. v. State of California, supra,* 171 Cal.App.4th at p. 1215 [language of former section 17556, subdivision (f) "must be limited" because it "so clearly

contravenes the intent of the voters in passing Proposition 4"].)
We have no basis to presume such stark fiscal effects would arise
from these provisions' compelled restatement, when those
provisions are conceded to be bystanders relative to the changes
wrought by a voter initiative. (See *County of Sacramento v.
Pfund* (1913) 165 Cal. 84, 88 ["to construe a statute amended in
certain particulars as having been wholly re-enacted as of the
date of the amendment, is to do violence to the code and all
canons of construction"].)

By treating those untouched statutory bystanders no
differently from materially changed or newly added provisions,
the Commission's approach leads to results "that no one would
consider reasonable." (*MacKinnon v. Truck Ins. Exchange*
(2003) 31 Cal.4th 635, 650; see *People v. Clark* (1990) 50 Cal.3d
583, 605.) The Commission's view implies that merely restating
a state-mandated duty in a ballot measure to renumber the
section, correct punctuation or grammar errors, or substitute
gender-neutral language (see, e.g., *Yoshisato, supra*, 2 Cal.4th
at pp. 983, 985) automatically relieves the state of its obligation
to reimburse local governments for performing their assigned
role. Ironically, such wholesale reallocation of financial burdens
would occur under the Commission's theory even if nothing in
the initiative changed any activities the local governments were
required to perform. Conversely, if the local government duties
listed here happened to appear in a completely separate statute
not subject to technical reenactment rather than appearing in
the section Proposition 83 amended in other respects, they
would have remained state mandates. The mere happenstance
that the mandated duties were contained in test claim statutes
that were amended in other respects not clearly germane to any
of the duties — and thus had to be reenacted in full under the

state Constitution — should not in itself diminish their character as state mandates.

So it is telling that the State respondents conspicuously avoid embracing the full scope of the Commission's reasoning. What they argue instead is that the compelled reenactment of the test claim statutes transformed the state mandate into a voter-imposed mandate because the voters *simultaneously* limited the Legislature's ability to revise or repeal the test claim statutes. They point to Proposition 83's amendment clause, which provides in relevant part: "The provisions of this act shall not be amended by the Legislature except by a statute passed in each house by rollcall vote entered in the journal, two-thirds of the membership of each house concurring, or by a statute that becomes effective only when approved by the voters. However, the Legislature may amend the provisions of this act to expand the scope of their application or to increase the punishments or penalties provided herein by a statute passed by a majority of each house thereof." (Voter Information Guide, Gen. Elec. (Nov. 7, 2006) text of Prop. 83, § 33, p. 138 (Voter Guide).) In their view, these provisions no longer qualify as legislatively imposed mandates because the Legislature now lacks the power to amend or repeal these test claim statutes using the ordinary legislative process.

We disagree. The strict limitation on amending initiatives generally — and the relevance of the somewhat liberalized constraints imposed by Proposition 83's amendment clause — derive from the state constitution. Article II, section 10, subdivision (c) of the California Constitution provides that an initiative statute may be amended or repealed only by another voter initiative, "unless the initiative statute permits amendment or repeal without the electors' approval." The

evident purpose of limiting the Legislature's power to amend an initiative statute " 'is to "protect the people's initiative powers by precluding the Legislature from undoing what the people have done, without the electorate's consent." ' " (*Shaw v. People ex rel. Chiang* (2009) 175 Cal.App.4th 577, 597 (*Shaw*).)  But we have never had occasion to consider precisely "what the people have done" and what qualifies as "undoing" (*ibid*.) when the subject is a statutory provision whose reenactment was constitutionally compelled under article IV, section 9 of the Constitution.

The State respondents' argument depends on one crucial assumption:  that because of article II, section 10, subdivision (c) of the state Constitution, none of the technically restated provisions may be amended, except as provided in the initiative's amendment clause.  Yet the parties and amicus curiae California State Association of Counties and League of California Cities have identified at least *nine* legislative amendments to statutes technically restated in Proposition 83 that — under the view espoused by State respondents — would be in violation of the initiative's amendment clause.  (See Voter Guide, *supra*, text of Prop. 83, § 33.)  These amendments contained provisions that neither expanded the scope of the initiative, increased the punishment, nor garnered a two-thirds vote of each house.  (Stats. 2011, ch. 15, § 443 [amending Pen. Code, § 667.5, subd. (a), which was technically restated in § 9 of Prop. 83]; Stats. 2011, ch. 15, § 468 [amending Pen. Code, § 3000, subd. (b), which was technically restated in § 17 of Prop. 83]; Stats. 2011, ch. 15, § 472 [amending Pen. Code, § 3001, subd. (a), which was technically restated in § 19 of Prop. 83]; Stats. 2011, ch. 15, § 473 [amending Pen. Code, § 3003, subd. (a), which was technically restated in § 20 of Prop. 83]; Stats.

2011-2012, 1st Ex. Sess. 2011, ch. 12, § 10 [amending Pen. Code, § 667.5, subd. (b), which was technically restated in § 9 of Prop. 83]; Stats. 2012, ch. 24, § 139 [amending Welf. & Inst. Code, § 6601, which was technically restated in § 26 of Prop. 83]; Stats. 2012, ch. 24, § 143 [amending Welf. & Inst. Code, § 6604, which was technically restated in § 27 of Prop. 83]; Stats. 2012, ch. 24, § 144 [amending Welf. & Inst. Code, § 6605, which was technically restated in § 29 of Prop. 83]; Stats. 2012, ch. 24, § 146 [amending Welf. & Inst. Code, § 6608, which was technically restated in § 30 of Prop. 83].) If the State respondents are correct that *any* amendment to a provision that happens to have been technically restated in a ballot measure must follow the amendment process provided in the initiative, then all of these amendments would be invalid.

The State respondents take a narrow view of the Legislature's power to amend a statutory provision when its reenactment in a ballot measure was compelled by the state Constitution. But they concede only "limited authority" supports this view. Indeed, the lone case cited by the State respondents is *Shaw*, but that case analyzed a legislative amendment aimed at the heart of a voter initiative, not a bystander provision that had been only technically restated. At issue in *Shaw* was Proposition 116, a 1990 voter initiative that in relevant part amended Revenue and Taxation Code section 7102, subdivision (a)(1) to direct that a portion of sales and use taxes related to motor vehicle fuel (hereafter spillover gas tax revenue) be transferred to the Public Transportation Account (PTA), which was newly designated as " '*a trust fund*' " within the State Transportation Fund. (*Shaw*, *supra*, 175 Cal.App.4th at pp. 588-589.). The trust fund was to be used " '*only* for transportation *planning and mass transportation* purposes.' "

(*Id.* at p. 589.) Proposition 116 also added section 7102, subdivision (d), which allowed the Legislature to amend section 7102 by means of a statute passed with a two-thirds vote of both houses, but only " '*if the statute is consistent with, and furthers the purposes of, this section.*' " (*Shaw*, at p. 590.) Notwithstanding these provisions, the Legislature in 2006 and 2007 further amended section 7102, subdivision (a)(1) to qualify the required transfer of spillover gas tax revenue with the words " 'except as modified as follows' " (*Shaw*, at p. 601) and added other provisions that "[e]ssentially . . . appropriated money that was otherwise directed to the PTA to various other government sources and obligations." (*Shaw*, at p. 592; see *id.* at p. 602.) The new subdivisions added by the Legislature went so far as to order these diversions from the PTA "notwithstanding any other provision of this paragraph or any other provision of law." (§ 7102, subd. (a)(1)(G) & (H).)

As the Court of Appeal readily observed, the Legislature's 2007 amendment was suspect for a specific reason: it sought to undo the very protections the voters had enacted in Proposition 116. (*Shaw*, *supra*, 175 Cal.App.4th at pp. 597-598.) Unlike Proposition 83, Proposition 116 had not merely restated a key provision without change. Rather, Proposition 116 had added language to Revenue and Taxation Code section 7102, subdivision (a)(1) designating the PTA as " '*a trust fund,*' " and elsewhere stated that the funds were available " '*only* for transportation, *planning and mass transportation* purposes.' " (*Shaw*, at p. 589.) So when the Legislature — a decade and seven years later — sought to undermine the voter-created trust fund by adding new provisions to divert those funds from uses the voters had previously designated, it was not amending a provision that had merely been technically restated by the

voters.  (*Shaw*, at p. 597; see *id*. at p. 601 ["The voters' intent to preserve spillover gas tax funding of the PTA would be frustrated if the Legislature could amend section 7102, subdivision (a)(1) to modify the amount of spillover gas tax revenue making it to the PTA."].)  Instead, the 2007 amendment sought to alter the voters' careful handiwork, both the text and its intended purpose, and therefore was required to comply with the limitations in the initiative's amendment clause.  (*Id*. at pp. 597-598.)  To grant the Legislature free rein to tinker with spillover gas tax revenue and thereby undermine the PTA's integrity would have defeated a core purpose of Proposition 116 — "to convert the PTA to a trust fund dedicated to supporting transportation planning and mass transportation projects, and to preserve the funding of the PTA for such projects with spillover gas tax revenue according to the formula specified in section 7102, subdivision (a)(1)."  (*Shaw*, at p. 601.)

By contrast, nothing in Proposition 83 focused on duties local governments were already performing under the SVPA.  No provision amended those duties in any substantive way.  Nor did any aspect of the initiative's structure or other indicia of its purpose suggest that the listed duties merited special protection from alteration by the Legislature.  According to the Voter Guide, the intended purpose of Proposition 83 was to increase penalties for violent and habitual sex offenders; prohibit registered sex offenders from residing within 2,000 feet of a school or park; require lifetime electronic monitoring of felony registered sex offenders; expand the definition of an SVP; and change the then-existing two-year commitment term for SVPs to an indeterminate commitment.  (Voter Guide, *supra*, Official Title and Summary of Prop. 83,, p. 42.)  Indeed, no indication appears in the text of the initiative, nor in the ballot pamphlet,

to suggest voters would have reasonably understood they were restricting the Legislature from amending or modifying any of the duties set forth in the test claim statutes. Nor is an overbroad construction of article II, section 10 of the California Constitution necessary to safeguard the people's right of initiative. (See *Bartosh v. Board of Osteopathic Examiners* (1947) 82 Cal.App.2d 486, 491-496.) To the contrary: Imposing such a limitation as a matter of course on provisions that are merely technically restated would unduly burden the people's willingness to amend existing laws by initiative.

A more prudent conclusion is to assign somewhat more limited scope to the state constitutional prohibition on legislative amendment of an initiative statute. When technical reenactments are required under article IV, section 9 of the Constitution — yet involve no substantive change in a given statutory provision — the Legislature in most cases retains the power to amend the restated provision through the ordinary legislative process. This conclusion applies *unless* the provision is integral to accomplishing the electorate's goals in enacting the initiative or other indicia support the conclusion that voters reasonably intended to limit the Legislature's ability to amend that part of the statute. This interpretation of article II of the Constitution is consistent with the people's precious right to exercise the initiative power. (See *Legislature v. Eu* (1991) 54 Cal.3d 492, 501.) It also comports with the Legislature's ability to change statutory provisions outside the scope of the existing provisions voters plausibly had a purpose to supplant through an initiative. (See *Methodist Hosp. of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 691.) We therefore hold that where a statutory provision was only technically reenacted as part of other changes made by a voter initiative *and* the Legislature has

retained the power to amend the provision through the ordinary legislative process, the provision cannot fairly be considered "expressly included in . . . a ballot measure" within the meaning of Government Code section 17556, subdivision (f).[4]

With that in mind, we turn to the statutory provisions identified by the Commission as the source for local government duties 1, 2, 3, 6, and part of 7 — i.e., Welfare and Institutions Code sections 6601, subdivision (i), 6605, former subdivisions (b)-(d), and 6608, subdivisions (a) and (b) and former subdivisions (c) and (d). The State respondents do not dispute that each of these provisions was technically restated in Proposition 83 under constitutional compulsion. They offer no reason — putting aside for the moment the expanded SVP definition — why these restated provisions should be deemed integral to accomplishing the initiative's goals. Nor have they identified any basis for believing that it was within the scope of the voters' intended purpose in enacting the initiative to limit the Legislature's capacity to alter or amend these provisions. The Commission therefore erred in concluding that those provisions were expressly included in a ballot measure approved by the voters merely because they were restated in the initiative's text.

## B.

Similar flaws afflict the Commission's analysis of local government duties 5, 7, and part of 8, which derive from Welfare and Institutions Code sections 6602, 6603, 6604, and 6605, former subdivision (d). The Commission erred when it

---

[4]    We disapprove *Shaw v. People ex rel. Chiang, supra*, 175 Cal.App.4th 577, to the extent it is inconsistent with this opinion.

concluded that these activities were expressly included in the ballot measure simply because Proposition 83 had technically restated the applicable provisions of sections 6604 and 6605. For the reasons stated below, the Commission also erred in concluding that sections 6602 and 6603 were "necessary to implement" Proposition 83.

The Commission's conclusion was based on the theory that Welfare and Institutions Code sections 6602 and 6603 were indispensable to the implementation of *other* provisions that — according to the Commission — were "expressly included" in Proposition 83. But we have determined that those provisions were *not* part of the "ballot measure" for purposes of Government Code section 17556, subdivision (f). And while Proposition 83 technically reenacted a provision of existing law stating that "[t]he rights, requirements, and procedures set forth in Section 6603 shall apply to all commitment proceedings" (Welf. & Inst. Code, § 6604.1, subd. (b)), this did not make Welfare and Institutions Code section 6603 "necessary to implement" the ballot measure, either. The question here is not whether the protections in that section — i.e., trial by jury, appointed counsel, assistance of experts — are required by due process. The critical question is instead whether the SVP civil commitment program, which triggers those procedures, is mandated by the state or by the voters.

We considered an analogous situation in *San Diego Unified School Dist. v. Commission on State Mandates* (2004) 33 Cal.4th 859 (*San Diego Unified*). There, we considered whether the costs associated with mandatory expulsion hearings for students found to be in possession of firearms at school (see Ed. Code, § 48915, former subd. (b); Stats. 1993, ch. 1256, § 2, pp. 7286-7287) were a reimbursable state mandate. The

Commission argued that they were not, pointing out that most or all of the costs associated with an expulsion hearing were required by the federal due process clause. (*San Diego Unified*, *supra*, 33 Cal.4th at pp. 879-880; see Gov. Code, § 17556, subd. (c).) We disagreed. Federal law, at the time, did not mandate expulsion for possessing a firearm at school. (*San Diego Unified*, at p. 881.) While federal due process did afford certain protections whenever an expulsion hearing was held, it did not require "that any such expulsion recommendation be made in the first place." (*Ibid*.) Because it was state law — and not due process — that required school districts to undertake an expulsion hearing in the first place, we held that the mandatory expulsion hearing costs were triggered by a state mandate and were fully reimbursable. (*Id.* at pp. 881-882.) Similarly, here, federal law does not require any inmate be civilly committed as an SVP. That mandate comes from state law.

Here again, the State respondents avoid defending the Commission's reasoning. Instead, they rely on the expanded definition of a " '[s]exually violent predator' " in Proposition 83. (Voter Guide, *supra*, text of Prop. 83, § 24, p. 135.) As they point out, the voters broadened the definition of an SVP within the meaning of Welfare and Institutions Code section 6600 in two ways. First, they reduced the required number of victims, so that an offender need only have been "convicted of a sexually violent offense against *one* or more victims," instead of two or more victims. (*Ibid*.; see Welf. & Inst. Code, § 6600, subd. (a)(1).) Second, the voters eliminated a provision that had capped at one the number of juvenile adjudications that could be considered a prior qualifying conviction. (Voter Guide, *supra*, text of Prop. 83, § 24, p. 136; Welf. & Inst. Code, § 6600, subd. (g).) The State respondents contend that the specified local government duties

became necessary to implement the ballot measure, in that the Counties had been under no obligation to perform *any* duties for this class of offenders until the voters by initiative expanded the definition of an SVP.

The Court of Appeal chose to dispose of this argument in a single sentence: "The Commission's 1998 decision . . . concluded that Welfare and Institutions Code section 6600 was not a basis for any of the duties for which the Counties sought reimbursement." (*County of San Diego*, *supra*, 7 Cal.App.5th at p. 36.) The statement is true, but only to a limited extent. The 1998 decision, which purported to address Welfare and Institutions Code sections 6250 and 6600 through 6608, *did* state that "[t]he Commission denied the remaining provisions of the test claim legislation because they do not impose reimbursable state mandated activities upon local agencies." (Cal. Com. on State Mandates, Statement of Decision No. CSM-4509, *supra*, at p. 12.)

Yet it would be misleading to suggest that Welfare and Institutions Code section 6600 was thereby rendered irrelevant to the duties set forth in the test claim statutes. None of the specified local government duties is triggered until an inmate is identified as someone who may be an SVP. (See §§ 6601, 6603, 6604, 6605, 6608.) Although the SVP definition does not *itself* impose any particular duties on local governments, it is necessarily incorporated into each of the listed activities. Indeed, whether a county has a duty to act (and, if so, what it must do) depends on the SVP definition. (See Voter Guide, *supra*, analysis of Prop. 83 by Legis. Analyst, p. 44 ["This measure generally makes more sex offenders eligible for an SVP commitment"]; cf. *San Diego Unified*, *supra*, 33 Cal.4th at p. 884 [acknowledging that changes in federal law concerning

27

mandatory expulsion for firearm possession "may lead to a different conclusion" as to whether expulsion hearings remain a state mandate in future years]; Cal. Com. on State Mandates, Statement of Decision No. 01-TC-18 (May 20, 2011), p. 39 <https://www.csm.ca.gov/decisions/052011sod.pdf> [as of November 15, 2018] [concluding that changes in federal law concerning mandatory expulsion for firearm possession made the associated hearing costs a federal mandate].) When more people qualify as potential SVPs, a county must review more records. It must file more commitment petitions, and conduct more trials.[5] One can imagine that if the roles were reversed — i.e., if the Legislature expanded the scope of a voter-created SVP program — the Counties would be claiming that the burdens imposed by the expanded legislative definition constituted a state mandate.

Unfortunately, the Commission never considered whether the expanded SVP definition in Proposition 83 transformed the test claim statutes as a whole into a voter-imposed mandate or, alternatively, did so to the extent the expanded definition incrementally imposed new, additional duties on the Counties. Its ruling granting the State respondents' request for mandate redetermination instead rested entirely on grounds that we now disapprove. Moreover, the parties admit — and the Court of

---

[5] The ballot pamphlet said as much: "This measure would also affect state and local costs associated with court and jail operations. For example, the additional SVP commitment petitions resulting from this measure would increase court costs for hearing these civil cases. Also, county jail operating costs would increase to the extent that offenders who have court decisions pending on their SVP cases were held in county jail facilities." (Voter Guide, *supra*, analysis of Prop. 83 by Legis. Analyst, p. 45.)

Appeal found — that the current record is insufficient to establish how, if at all, the expanded SVP definition in Proposition 83 affected the number of referrals to local governments.  (See *County of San Diego*, *supra*, 7 Cal.App.5th at p. 36, fn. 14; cf. *San Diego Unified*, *supra*, 33 Cal.4th at p. 889 [additional state statutory protections that were "incidental" to federal due process requirements, "producing at most de minimis added cost, should be viewed as part and parcel of the underlying federal mandate, and hence nonreimbursable under Government Code section 17556, subdivision (c)"].)  Under the circumstances, we find it prudent to remand the matter to the Commission to enable it to address these arguments in the first instance.  (See *Lucia Mar Unified School Dist. v. Honig*, *supra*, 44 Cal.3d at p. 837; *California School Boards Assn. v. State of California*, *supra*, 171 Cal.App.4th at p. 1217.)

## III.

Constitutional requirements governing matters such as voter initiatives and the Legislature's financial responsibility to local governments must be read in context.  When a ballot initiative is used to amend any part of an existing statutory section, the California Constitution requires that the initiative include the text of the entire statutory section to enable voters to understand the context of the proposed change.  (Cal. Const., art. IV, § 9.)  But this requirement is a modest means of informing voters about the proposed change by ensuring there is a straightforward before-and-after comparison of the statutory text.  Neither by its terms nor by implication does it prevent a future Legislature from making appropriate amendments to the provisions that are merely technically restated in a ballot measure.  (See Cal. Const., art. II, § 10, subd. (c).)  Likewise, mere technical restatements do not necessarily

transform existing state mandates into voter-imposed mandates.  (See Gov. Code, § 17556, subd. (f).)

Because the Commission erred in concluding otherwise, we affirm the judgment of the Court of Appeal insofar as it reversed the judgment of the trial court.  We remand the matter to the Court of Appeal, so it can direct the trial court to modify its judgment as follows:  the trial court shall issue a writ of mandate directing the Commission to set aside the decisions challenged in this action and to reconsider the test claim in a manner consistent with this opinion.

**CUÉLLAR, J.**


**We Concur:**
**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**MEEHAN, J.**[*]

---

[*] Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** County of San Diego v. Commission on State Mandates
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 7 Cal.App.5th 12
**Rehearing Granted**

_____

**Opinion No.** S239907
**Date Filed:** November 19, 2018
_____

**Court:** Superior
**County:** San Diego
**Judge:** Richard E. L. Strauss

_____

**Counsel:**

Thomas E. Montgomery, County Counsel (San Diego), Timothy M. Barry, Chief Deputy County Counsel; Mary C. Wickham, County Counsel (Los Angeles), Sangkee Peter Lee, Deputy County Counsel; Leon J. Page, County Counsel (Orange), Suzanne E. Shoai, Deputy County Counsel; Robyn Truitt Drivon, County Counsel (Sacramento), Krista Castlebary Whitman, Assistant County Counsel; and Jean-Rene Claude Basle, County Counsel (San Bernardino), for Plaintiffs and Appellants.

Laura Arnold for California Public Defenders Association and Law Offices of the Public Defender for the County of Riverside as Amici Curiae on behalf of Plaintiffs and Appellants.

Jennifer N. Henning for California State Association of Counties and League of California Cities as Amici Curiae on behalf of Plaintiffs and Appellants.

Kamala D. Harris and Xavier Becerra, Attorneys General, Edward C. DuMont, State Solicitor General, Janill L. Richards, Principal Deputy State Solicitor General, Douglas J. Woods and Thomas S. Patterson, Assistant Attorneys General, Kathleen Boergers and Michael J. Mongan, Deputy State Solicitors General, Mark R. Beckington and Kim L. Nguyen , Deputy Attorneys General, for Defendants and Respondents Department of Finance, State Controller and State of California.

Camille Shelton and Matthew B. Jones for Defendant and Respondent Commission on State Mandates.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Timothy M. Barry
Chief Deputy County Counsel
1600 Pacific Highway, Room 355
San Diego, CA  92101-2469
(619) 531-6259

Michael J. Mongan
Deputy State Solicitor General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 510-3920